1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MUTUAL OF ENUMCLAW INS. CO., as an
ASSIGNEE of V.K. POWELL
CONSTRUCTION CO. L.L.C.,

      Plaintiff,

    v.

ST. PAUL FIRE AND MARINE INS. CO.,

      Defendant.

CASE NO. C05-0312C

ORDER

15    This matter comes before the Court on the parties' cross motions for summary judgment (Dkt.

16  Nos. 16 & 18).  Having carefully considered the memoranda, declarations, and exhibits submitted by all

17  parties and finding oral argument unnecessary, the Court GRANTS Defendant's motion and DENIES

18  Plaintiff's motion for the following reasons.

19  **I.    UNDISPUTED MATERIAL FACTS**

20    On September 27, 2001, Christine Downing was installing alarm boxes and mapping out wiring in

21  the first-floor sacristy of St. Joseph's Catholic Church in Yakima, Washington.  Downing was an

22  apprentice electrician for Ziegler Electric, Inc. ("Ziegler"), the electrical subcontractor hired by general

23  contractor V.K. Powell Construction ("Powell") for the St. Joseph's project.  Downing worked primarily

24  alone in the sacristy that day, while José Sóto of Pro Insulation-LBC, Inc. ("Pro") was installing

25  insulation in the walls of the confessionals adjacent to the sacristy.  (Branom Decl. Ex. 1 at 6; Ex. 10

26  ORDER – 1

at 136–38.)  All Seasons Heating and Air Conditioning ("All Seasons") had also performed work in the area of the sacristy and confessionals, and was responsible for installing heating ducts running from the basement into the main level of the church; an opening (approximately twenty inches wide by eight feet long) for these ducts had been cut in the floor of a narrow corridor behind the confessionals and adjacent to the sacristy.[1]  (*Id.* Ex. 2 at 24.)  The wall that would ultimately separate the sacristy from the duct corridor had been framed with metal studs on sixteen-inch centers, but no insulation or wallboard had yet been installed.  (*Id.* Ex. 1 at 7; Ex. 2 at 55.)

In the process of climbing down from a ladder, Downing stepped backward between the studs in the unfinished wall separating the sacristy from the duct corridor, and onto what she believed was a scrap of insulation on the floor of the duct corridor.  (*Id.* Ex. 1 at 13–18.)  In fact, the insulation covered the hole into which the heating ducts were to be fitted by All Seasons.  (*Id.* at 14.)  Downing fell through the hole into the basement fifteen feet below, suffering injuries to her wrist, elbow, shoulder, and neck.

Downing sued Powell, All Seasons, Pro, and various insurers for her injuries.  (Sommermeyer Decl. Ex. 2.)  During discovery, it was discovered that the insulation scrap covering the duct hole had been placed there at the direction of Powell's superintendent, Joseph Beckstrand, to prevent cold drafts from the basement flowing into the main level.  (Branom Decl. Ex. 2 at 25.)  Beckstrand did not recall whether he asked employees of Pro to place the insulation over the hole, and Pro's employees denied doing so.  (*Id.* at 27–28; Sommermeyer Decl. Ex. 9 at 37–38.)  Downing testified that because insulation "scraps had been laying in different places throughout the [sacristy] floor," the piece of insulation covering the hole behind the confessional "looked like just another piece of insulation."  (Sommermeyer Decl. Ex. 12, at 83.)  However, she further testified that it did not appear as if the insulation in the duct corridor had been professionally installed over the holes—rather, it appeared to her as if the scrap had

---

[1] The Court has relied, in part, on a helpful schematic of the church's floor plan, illustrating the spatial relationships between the sacristy, confessionals, and duct corridor, that is attached as an exhibit to the deposition of Pro employee José Sóto.  (*See* Branom Decl. Ex. 10 at 174.)

ORDER – 2

merely been thrown there.  (*Id.*)  José Sóto had been hanging insulation in the confessional walls that day, and admitted seeing scraps of insulation on the sacristy floor while Downing was working.  (*Id.* Ex. 10 at 140.)  However, no party suggested that Pro was responsible for placing the insulation scraps concealing the hole into which Downing fell.

Downing's personal-injury suit also triggered the insurance arrangements between Powell, the subcontractors, and their respective insurers.  As required by its subcontract, Ziegler Electric had provided Powell with a certificate of insurance that insured Powell against harm caused by Ziegler's employees.  (Sommermeyer Decl. Ex. 5 at 1.)  The plaintiff in this case, Mutual of Enumclaw ("MOE"), provided the endorsement on Ziegler's certificate.  (*Id.*)  Pro also carried a commercial general liability ("CGL") policy, written by defendant St. Paul, that insured Powell against harm "arising out of" Pro's work at the job site.  (Branom Decl. Ex. 6 at 100.)  The policy defined Pro's "work" in three ways relevant to this dispute: (1) as work or services that Pro performed, or that others performed for it; (2) "all equipment, materials, or parts provided with or for" Pro's work; and (3) "any statement made, or which should have been made, about the . . . safety, or use of [Pro's] work" and "all warnings, instructions, or directions provided, or which should have been provided, with or for [Pro's] work."  (*Id.* at 78.)

The parties ultimately settled Downing's suit for $800,000, of which MOE paid $500,000 for Powell via the endorsement on Ziegler's certificate.  (Branom Decl. Ex. 7; Valentine Decl. ¶ 6.)  Powell's own primary carrier, as well as All Seasons's carrier, also contributed.  (Valentine Decl. ¶ 6.)  Finally, St. Paul contributed $20,000 for Pro directly, but nothing for Powell via the "additional insured" provision. (*Id.*)  MOE then instituted this action, seeking payment by St. Paul for half of the $500,000 that MOE paid into the Downing settlement.[2]

---

[2] The parties dispute whether MOE's request for relief is for equitable contribution or contractual relief by virtue of Powell's assignment of rights to MOE.  (*See* Def.'s Mot. 22–24; Pl.'s Reply 1–2.)

ORDER – 3

II.    **LEGAL ANALYSIS**

      A.    *Relevant Standards on Cross Motions for Summary Judgment*

    This matter is before the Court on cross motions for summary judgment that mirror each other almost perfectly. Although the parties have not stipulated to a common set of undisputed facts, they rely on nearly identical facts and contend that there are no disputed issues of material fact requiring a trial. *See A&A Concrete, Inc. v. White Mtn. Apache Tribe*, 781 F.2d 1411, 1417 n.1 (9th Cir. 1986) (noting that cross motions for summary judgment "ordinarily imply agreement between the parties that there are no disputed issues of fact"). The Court is cognizant that even "'inherently contradictory claims'" by cross motions do not necessarily signify "an agreement that if one is rejected the other is necessarily justified.'" 10A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720, at 330 (3d ed. 2005) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). And even where cross motions have been filed, the district court must independently determine whether a disputed issue of material fact exists that would preclude summary judgment for either party. *See United States v. Curtis-Nevada Mines, Inc.*, 415 F. Supp. 1373, 1376 (E.D. Cal. 1976), *rev'd in part on other grounds*, 611 F.2d 1277 (9th Cir. 1980).

    However, in this case, the parties' contentions are mutually exclusive as a matter of law as they seek entirely inconsistent relief: MOE seeks an order directing St. Paul to pay $250,000, while St. Paul seeks an order declaring that it has no obligation to make such a payment and dismissing MOE's complaint. Assuming the Court may properly reach a decision on undisputed facts on common issues that are dispositive of both motions, it may render summary judgment for one party and against the other. Indeed, in their respective oppositions to the other's summary judgment motions, both MOE and St. Paul specifically seek the denial of their opponent's motion *and* the concurrent granting of their own motion. (*See* Pl.'s Opp'n 8; Def.'s Opp'n 1.) *Cf. Starsky v. Williams*, 512 F.2d 109, 113 (9th Cir. 1975) ("[T]here is no reason why parties cannot agree to try a case upon affidavits, admissions, and agreed documents. In effect, that is what was done here. No objection whatever was made at the time of the

ORDER – 4

1  submission that there were questions of fact which could not be decided upon the evidence before the

2  trial court.").

3          As in all such motions, the moving party is entitled to summary judgment under Rule 56(c) only

4  "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

6  entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In determining whether a genuine issue

7  of material fact exists, the court must view all evidence in the light most favorable to the non-moving

8  party and draw all reasonable inferences its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

9  248–50 (1986).  The moving party has the burden to establish that there is no genuine issue of material

10  fact, with "materiality" defined according to the substantive law governing the dispositive issues.  *British*

11  *Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978).  Assuming it meets this burden, the non-

12  moving party then must show that there is, in fact, a genuine issue for trial.  *Anderson*, 477 U.S. at 250.

13  In making this showing, the non-moving party may not rely on speculative arguments or disputes over

14  irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *T.W. Elec. Serv., Inc. v.*

15  *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

16          B.      *Common Issues in Both Motions for Summary Judgment*

17          At least at the threshold, both parties' summary judgment motions turn on a single legal issue: did

18  Downing's accident "arise out of" the "work" performed by Pro, as those terms are defined by the St.

19  Paul policy?[3]  The parties agree that absent a finding that the arising-out-of-clause in St. Paul's policy is

20  sufficiently broad to encompass the undisputed circumstances of Downing's accident, the policy requires

21  no contribution to MOE.[4]  (*See* Pl.'s Mot. 4; Def.'s Opp'n 5.)  Thus, if the Court agrees that liability is

22

23          [3] Under Washington law, the interpretation of an insurance contract is an appropriate subject for
   summary judgment.  *Toll Bridge Auth. v. Aetna Ins. Co.*, 773 P.2d 906, 908 (Wash. Ct. App. 1989).

24
           [4] For purposes of this analysis, the Court assumes that Powell is an additional insured to whom
25  contribution is required if Downing's accident arose out of Pro's work for Powell.  (*See* Branom Decl.

26  ORDER – 5

1   not triggered under the arising-out-of clause in St. Paul's policy, no further analysis is required; MOE's

2   motion must be denied, St. Paul's motion must be granted, and the case must be dismissed in its entirety.

3         *1.     What causation standard applies to arising-out-of clauses?*

4        Before determining whether Downing's accident "arose out of" Pro's "work," the quoted words

5   must be defined and their scope fully understood.  As an initial matter, when interpreting insurance

6   policies under Washington law, the Court must give the policy "a fair, reasonable, and sensible

7   construction as would be given to the contract by the average person purchasing insurance." *Mutual of*

8   *Enumclaw Ins. Co. v. Jerome*, 856 P.2d 1095, 1096 (Wash. 1993) (internal quotes omitted).  Terms left

9   undefined must be "given their plain, ordinary, and popular meanings" in a manner that preserves the

10  reasonable expectations of the parties to the contract.  *Id.* (internal quotes omitted).

11       There is ample Washington case law interpreting arising-out-of clauses, at least in the automobile-

12  insurance context.  Those cases have found the phase to be unambiguous, and have interpreted such

13  clauses as calling for a more liberal causation standard than demanded by language such as  "caused by"

14  or "resulted from."  *See Aetna*, 773 P.2d at 908.  One court held that an arising-out-of clause actually

15  "precludes an inquiry into the causation of an accident," and instead "is understood to mean 'originating

16  from,' 'having its origin in,' 'growing out of,' or 'flowing from.'"  *Krempl v. Unigard Sec. Ins. Co.*, 850

17  P.2d 533, 535 (Wash. Ct. App. 1993).  However, such clauses are not so broad that events bearing no

18  logical nexus to the insured activity will trigger liability.  *See State Farm Mutual Auto. Ins. Co. V.*

19  *Centennial Ins. Co.*, 543 P.2d 645, 646 (Wash. Ct. App. 1975) (requiring "a degree of causality"

20  between injury and covered activity).  In that vein, a connection between a covered activity and the "mere

21  situs" of an accident is insufficient for liability to attach under the phrase "arising out of."  *McCauley v.*

22  *Metro. Prop. & Cas. Ins. Co.*, 36 P.3d 1110, 1113 (Wash. Ct. App. 2001).  Regardless of whether the

23

24  ────────────────

25  Ex. 6 at 98–99 (defining "Additional Protected Persons" to include "a contractor on whose behalf [Pro is] performing operations").)

26  ORDER – 6

1  clause is unambiguous,[5] Washington law requires that the Court interpret this exclusionary clause against

2  St. Paul and employ a presumption in favor of coverage. *See Mid-Century Ins. Co. v. Henault*, 879 P.2d

3  994, 997 (Wash. Ct. App. 1994).

4      Outside the automobile-insurance context, MOE proposes that the Court apply an expansive

5  interpretation defining arising-out-of clauses in CGL policies as "broadly link[ing] a factual situation with

6  the event creating liability, and connot[ing] only a *minimal causal connection or incidental relationship.*"

7  *Syufy*, 69 Cal. App. 4th at 328 (emphasis added).  Other jurisdictions have viewed such clauses in CGL

8  policies as equally broad. *See Merchants Ins. Co. v. U.S. Fidelity & Guar. Co.*, 143 F.3d 5, 9 (1st Cir.

9  1998) (under Massachusetts law, "'arising out of' is much broader than 'caused by'; the former phrase is

10  considered synonymous with 'originate' or 'come into being'"); *Meadow Valley*, 27 P.3d at 597 ("As

11  used in a liability insurance policy, the words 'arising out of' are very broad, general and

12  comprehensive. . . . and require only that there be some causal relationship between the injury and the risk

13  for which coverage is provided.").

14      Descriptions of such abstract concepts go only so far, but it is clear that in Washington and most

15  other jurisdictions, an arising-out-of clause in a CGL policy should be interpreted as setting an

16  intermediate causation standard: more liberal than proximate cause, yet still requiring a logical nexus or

17  relationship between the injury and the risk insured against. *Cf. Syufy*, 69 Cal. App. 4th at 329 (collecting

18  cases).

19          2.    *Did Downing's injury "arise out of" Pro Insulation's "work"?*

20      As explained earlier, the St. Paul policy provides coverage (and a corresponding duty to

21  contribute) to Powell for injuries arising out of Pro's "work."  The policy contains three somewhat

22  _____

23      [5] Cases from other jurisdictions that have specifically addressed CGL policies appear split as to
    whether arising-out-of clauses are ambiguous. *Compare Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal.

24  App. 4th 321, 327 (1999) (finding clause ambiguous) *and Worsham Const. Co. v. Reliance Ins. Co.*, 687
    P.2d 988, 990–91 (Colo. Ct. App. 1984) (same) *with Meadow Valley Contractors, Inc. v. Transcont'l*

25  *Ins. Co.*, 27 P.3d 594, 597 (Utah Ct. App. 2001) (unambiguous).

26  ORDER – 7

1   circular definitions of "work" that are relevant to this dispute: (1) work or services that Pro performed, or

2   that others performed for it; (2) "all equipment, materials, or parts provided with or for" Pro's work; and

3   (3) "any statement made, or which should have been made, about the . . . safety, or use of [Pro's] work"

4   and "all warnings, instructions, or directions provided, or which should have been provided, with or for

5   [Pro's] work."  (Branom Decl. Ex. 6 at 78.)  Thus, applying an appropriately broad definition of "arising

6   out of," the St. Paul policy is implicated if Downing's injuries bore a minimal or incidental causal

7   connection to one of these three definitions of Pro's work.

8              a.      *Work performed, or to be performed, by or on behalf of Pro Insulation*

9              Accepting the most expansive feasible interpretation of Pro's "work," as defined in the

10  subcontract and the St. Paul policy, it is clear that Pro performed work in the vicinity where Downing

11  was injured: José Sóto testified that he was in the process of insulating the walls between the sacristy and

12  confessionals, and would ultimately insulate the unfinished wall between the sacristy and the duct corridor

13  through which Downing stepped before falling.  (Branom Decl. Ex. 10 at 137–39.)  It is not enough,

14  however, to find only that Downing's accident occurred in close proximity to where Pro had been

15  working.  *See McCauley*, 36 P.3d at 1113.  Liability is not triggered under St. Paul's policy unless the

16  accident itself—that is, the sequence of Downing backing through the unfinished sacristy wall, stepping

17  onto the scrap of insulation, and falling through the duct hole—arose out of work that Pro had performed

18  or was responsible for performing, or that had been performed on its behalf.  MOE does not argue that

19  Pro performed (or was required to perform) any work related to insulating the floor of the duct corridor.

20  To the contrary, Powell's superintendent testified that he alone was responsible for placing the insulation

21  over the hole rather than implementing more appropriate safety measures.  (Branom Decl. Ex. 2 at 39.)

22  Sóto testified without contradiction that he did not place the insulation over the hole (*id.* Ex. 10 at 13),

23  and Downing testified that it was an apparently discarded insulation scrap—clearly not part of Pro's

24  work—that misled her into stepping into the hole (*id.* Ex. 1 at 14–15).

25

26  ORDER – 8

A brief comparison to cases interpreting arising-out-of clauses in CGL policies illustrates the lack of nexus present in this case. First, in *Syufy*, an employee of the company hired by a theater owner to upgrade the building's lighting and temperature controls was required to perform work on the roof of the theater. 69 Cal. App. 4th at 324. As he exited the roof through a hatch, the hatch accidentally closed on his hand and injured him; the parties agreed that the hatch was defective due to the negligence of the theater owner. *Id.* at 328–29. Because the worker could not perform the required work on the roof without passing through the hatch, his injuries necessarily "arose out of" his work even though he had performed no work on the hatch itself and bore no fault for his injuries. *Id.*

In *Meadow Valley*, the general contractor on a highway construction project hired a subcontractor to extend existing drainage lines; as part of that work, the subcontractor was required to divert a drainage stream to allow for concrete pouring. 27 P.3d at 595. Heavy rains caused the diversion ditch—which could not handle the capacity of the main drainage lines—to overflow and flood neighboring businesses. *Id.* at 595–96. The court found that the flooding damage arose out of the subcontractor's work because it could not have completed the project without diverting the drainage ditch as it did. *Id.* at 597–98. Although the subcontractor was not necessarily at fault, "the flooding originat[ed] from, [was] incident to, [and was] in connection with" its work. *Id.* at 598 (internal quotations omitted).

Similarly, in *Merchants Insurance*, a worker for a subcontractor on a bridge-construction project was injured when an employee of the general contractor accidentally pinned the worker's arm between two pieces of demolition equipment. 143 F.3d at 7. Although the general contract was clearly at fault for the accident, the injuries arose out of the subcontractor's work because its worker was injured while performing an assigned task: "It was not simply because the two companies happened to be working in the same location" where the injury occurred; rather, "the injury was a consequence of the work" that the subcontractor was properly performing. *Id.* at 9–10.

ORDER – 9

1   Together, these cases illustrate the nexus required between the insured activity and the injury to

2   trigger coverage under an arising-out-of clause in a CGL policy: in each case, the harm occurred as a

3   natural consequence of the agreed scope of the insured's work: each of the acts leading to the injury

4   (passing through the roof hatch, building a diversion ditch, working with demolition equipment) were

5   required incidents to, or actually part of, the work to be performed.  No analogous nexus exists between

6   Downing's accident and the work performed by Pro.

7           b.      *Materials provided with or for Pro Insulation's work*

8           MOE further argues that policy language defining Pro's work as including its "materials"

9   establishes the required minimal causal connection to Downing's injury.  Although Pro had no work-

10  related duty to install insulation over the duct corridor, and had no supervisory responsibility for any

11  employee who had such a duty, MOE argues that the presence of insulation scraps on the sacristy floor

12  and over the hole is sufficient to find that Downing's accident arose out of Pro's work : "Clearly there is

13  a connection between the insulation material and the accident causing injury to Christine Downing.  [The

14  insulation scrap] doesn't have to be the proximate cause of the accident, but merely needs to be

15  connected to the insulation in some way."  (Pl.'s Opp'n 7.)

16          The St. Paul policy does not contemplate a fault-based allocation, and the Court agrees that

17  liability is triggered not just by events for which Pro's work was the proximate cause, but all events

18  sharing a minimal causal connection to Pro's work materials.  However, only a torturously expansive

19  definition of "arising out of" would draw a reasonable causal connection between Pro's materials and

20  Downing's accident.  Scraps of materials in an area where Pro was not assigned to work—and placed

21  there at Powell's sole direction—are not sufficiently connected to Downing's accident to engage the St.

22  Paul policy.  The Court must conclude that injuries arising from a general contractor's misuse of a

23  subcontractor's materials to conceal a dangerous workplace hazard is not "a risk against which [the

24  parties] might reasonably expect those insured under the policy would be protected."  *State Farm*, 543

25  P.2d at 647.

26  ORDER – 10

1          *c.       Warnings or statements that Pro Insulation should have provided*

2          Finally, MOE argues that the failure of Pro's workers (particularly José Sóto) to warn Powell or

3   Downing of a dangerous workplace condition created a nexus between Downing's accident and Pro's

4   work.  This argument relies on several factual predicates, each of which the Court accepts, for purposes

5   of this analysis, in the light most favorable to MOE: (1) as the sole insulation subcontractor on the job

6   site, Pro was responsible for cleaning up all insulation scraps; (2) José Sóto knew of the hole in the duct

7   corridor and saw Downing working nearby in the sacristy; (3) Sóto was responsible for scraps of

8   insulation on the sacristy floor and knew that Powell was responsible for placing a similar scrap over the

9   duct hole; and (4) Downing was misled by the scraps on the sacristy floor into assuming that the

10  insulation over the duct hole was on solid ground.

11         Accepting these facts as true, MOE argues that Sóto's failure to clean up the scraps of insulation

12  on the sacristy floor and failure to warn Powell or Downing of the scrap covering the duct hole

13  demonstrates that Downing's accident arose out of Pro's work.  (Pl.'s Mot. 7.)   The Court agrees that

14  state and federal occupational-safety regulations "should be construed to protect not only an employer's

15  own employees, but all employees who may be harmed by the employer's violation of the regulations."

16  *Martinez Melgoza & Assocs., Inc. v. Dep't of Labor & Indus.*, 106 P.3d 776, 780 (Wash. Ct. App. 2005)

17  (internal quotations omitted).  Moreover, the St. Paul policy defines Pro's work to encompass warnings,

18  statements, instructions, or directions that Pro provided, "or which should have been provided."

19  (Branom Decl. Ex. 6 at 78.)

20         However, this definition of work is triggered only if the regulations assign a duty to protect

21  workers for other employers against dangerous conditions *not* created by Pro and *not* under Pro's

22  supervision or control.  Although a general contractor is obliged to ensure a safe work environment for

23  all employees of all employers working at the job site, there is no such omnibus duty for subcontractors.

24  *See Weinert v. Bronco Nat'l Co.*, 795 P.2d 1167, 1170 (Wash. Ct. App. 1990) (subcontractor charged

25  with "more limited duty" than general contractor to enforce safety regulations).  This principle is

26  ORDER – 11

1    expressed in Washington as the multi-employer doctrine, under which "an employer who *controls or*

2    *creates* a worksite safety hazard may be liable under [safety regulations] even if the employees threatened

3    by the hazard are solely the employees of another employer." *Melgoza*, 106 P.3d at 779 (internal

4    quotations omitted) (emphasis added). That Pro was obligated to provide all required warnings related to

5    its own work does not mean that its workers bore responsibility for warning all workers at the site of

6    Powell's misuse of insulation materials. Nor would it be reasonable to deem Sóto responsible for failing

7    to warn Powell of a condition that Powell itself created. (*See* Pl.'s Mot. 6.)

8         Of course, there is no basis in the record to even suggest that Pro exercised any control over the

9    duct corridor or floor opening therein. *Cf. Melgoza*, 106 P.3d at (subcontractor owed duty by virtue of

10   exercising control over project); *Weinert*, 795 P.2d at 1170 (building owner and siding subcontractor

11   owed duty of safety to employee of third-tier subcontractor injured by faulty scaffolding even though they

12   did not know of and were not responsible for defects). Under Washington law, the undisputed facts do

13   not show that Pro was under a duty to warn Downing or Powell of a condition created by Powell and

14   outside of Pro's control. Because Pro was under no duty to provide such a warning, there is no nexus

15   between Downing's accident and the policy's definition of Pro's work as encompassing

16   "warnings . . . which should have been provided with or for [Pro's] work."

17   **III.   CONCLUSION AND ORDER**

18        The undisputed factual record on which both parties rest their respective motions for summary

19   judgment demonstrates that Christine Downing's injuries did not arise out of any of the definitions of Pro

20   Insulation's "work" in the St. Paul policy. The presence and use of insulation scraps in a location and

21   manner not contemplated as part of Pro's work and placed there at Powell's exclusive direction does not

22   create even a "minimal causal connection or incidental relationship" between Downing's fall and Pro's

23   work. *Cf. Mutual of Enumclaw*, 856 P.2d at 1097 (arising-out-of clause not implicated unless insured

24   activity "was more than a mere coincidental place in which the injury occurred") (internal quotations

25   omitted)). As such, Downing's accident did not originate from, have its origin in, grow out of, or flow

26   ORDER – 12

from work performed by Pro, materials over which Pro was responsible, or warnings that Pro was obligated to provide.  In the absence of such a nexus, there is no basis for contribution under the policy, and therefore no circumstances under which MOE can succeed in this case.[6]

Defendant St. Paul has carried its burden of demonstrating that there are no genuine issues of material fact precluding summary judgment in its favor.  Correspondingly, Plaintiff MOE has failed to demonstrate that it is entitled to contribution under St. Paul's policy as a matter of law.  Accordingly, the Court DENIES plaintiff Mutual of Enumclaw's motion for summary judgment, and GRANTS defendant St. Paul's motion.  The Court ORDERS this case DISMISSED WITH PREJUDICE, in its entirety.

SO ORDERED this 4th day of January, 2006.

UNITED STATES DISTRICT JUDGE

---

[6] Given this conclusion, there is no need to determine whether (1) the subcontract between Powell and Pro Insulation further limits St. Paul's liability; (2) MOE's suit is properly construed as one for equitable contribution or relief on the contract; or (3) MOE is entitled to its attorneys fees under the rule of *Olympic Steamship v. Centennial Ins. Co.*, 811 P.2d 673 (Wash. 1991).

ORDER – 13